**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

─────────────────────────────

**ELIZABETH MICHELLE GRATTAN,**

                    **Plaintiff,**                              **18-CV-808Sr**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                    **Defendant.**

─────────────────────────────

## DECISION AND ORDER

            As set forth In the Standing Order of the Court regarding Social Security

Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have

consented to the assignment of this case to the undersigned to conduct all proceedings

in this case, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g). Dkt.

#20.


## BACKGROUND

            Plaintiff received supplemental security income ("SSI") benefits from the

Social Security Administration ("SSA"), from the age of 7 until she reached the age of

18 due to attention deficit hyperactivity disorder ("ADHD"), and oppositional defiant

disorder ("ODD"). Dkt. #5, p.14. Plaintiff subsequently submitted numerous applications

for SSI which were denied initially and then abandoned. Dkt. #5, p.14. This application

for SSI benefits was filed by plaintiff on January 16, 2015, at the age of 24, alleging

disability due to mood disorder, bipolar disorder, post traumatic stress disorder

("PTSD"), ADHD, ODD, reactive attachment disorder, borderline personality and drug dependence. Dkt. #5, p.68.

On June 7, 2017, plaintiff appeared by telephone with counsel present and testified, along with an impartial vocational expert ("VE"), Sharon Ringenberg, at an administrative hearing before Administrative Law Judge ("ALJ"), Rosanne Dummer. Dkt. #5, pp.34-66. Plaintiff was not present at the hearing because she slept through her alarm. Dkt. #5, pp.37-38. Plaintiff has a GED and has only worked for approximately a month and a half back in 2013. Dkt. #5, p.40. She testified that she was not currently looking for work or training programs because her mental health providers had excused her from work until she could control her anger outbursts and mood swings. Dkt. #5, pp.40-41. She testified that she constantly feels "like every day I'm struggling to do everything, and I'm overwhelmed and angry while trying to do it." Dkt. #5, p.42.

Plaintiff had recently been in and out of jail. Dkt. #5, pp.43-44. She was attempting to restart her medication, explaining that the medication that she was on when she was at Hillside Children's Center worked, but when she became an adult, her health insurance and social services lapsed and her medication was changed and didn't work. Dkt. #5, pp. 43-44 & 53-54. She smoked marijuana to calm down. Dkt. #5, p.54. When she stopped smoking marijuana, she felt that her mental health problems got worse, explaining this was the period when she was in and out of jail and her children were taken by child protective services. Dkt. #5, p.55. Plaintiff gave up her parental

rights to her children, ages 7 and 2. Dkt. #5, p.56. Plaintiff had been in special education classes at school with an Individualized Education Plan for a 6:1:1 classroom and received SSI benefits until she turned 18. Dkt. #5, p.56.

Plaintiff lives with her boyfriend in a studio apartment and testified that a typical day involves arguments about what she is going to do which causes her to be stressed out and stay in the house because she doesn't "want to freak out on someone and get arrested." Dkt. #5, pp.45-66. She explained that at least six times a day, something as small as someone messing up her cup of coffee will trigger a "meltdown," where she is "worked up," "shaking," "sweaty," "screaming" and "can't think" or "can't function." Dkt. #5, p.49. After such an episode, plaintiff testified that she feels guilty and bad for getting upset and yelling. Dkt. #5, pp.49-50. When she becomes overwhelmed, she can't remember what she is doing, which makes her even more angry and causes her to shut down. Dkt. #5, p.51. She requires reminders to take her medication or go to an appointment or call her mother. Dkt. #5, p.50. On Thanksgiving, the police were called to break up a physical altercation between plaintiff and her mother. Dkt. #5, pp.56-57. Plaintiff's boyfriend does the cooking to keep plaintiff from throwing a hot pan across the room. Dkt. #5, p.50. Often, she will stay in her pajamas all day. Dkt. #5, p.51. She spends her time watching television, coloring or walking her dog. Dkt. #5, p.47.

When asked to assume an individual who could understand, remember and carry out instructions for short, routine, repetitive-type tasks without fast pace or

high production goals and who could sustain attention and concentration for two-hour segments and tolerate brief and superficial contact with coworkers and supervisors but rare to no contact with the public, the VE testified that such an individual could perform jobs as an industrial cleaner, laundry worker or janitor, each of which were medium exertion jobs, and could perform light jobs such as routing clerk, mail sorter, housekeeper cleaner, retail marker or electrical accessories assembler. Dkt. #5, pp.60-61. When asked if such jobs would accommodate an individual who was off task as much as 25 percent of the work day or absent 3-4 days per month, the VE testified that such an individual would not be able to maintain competitive employment. Dkt. #5, pp.61-62. The VE testified that more than 5 percent of time off task or more than one day a month absence would preclude competitive employment. Dkt. #5, p.62. The VE testified that there are no jobs in which an individual works in isolation and that an individual who was unable to interact appropriately on a consistent basis would eventually be terminated. Dkt. #5, p.63.

Subsequent to the hearing, the ALJ submitted interrogatories to Elizabeth A. Kalb, Ph.D., for consideration upon the objective record evidence. Dkt. #5, p.14. Upon review of the record, Dr. Kalb noted the myriad diagnoses that had been given to plaintiff over the years and stated that she had attended to the symptoms observed and described in the record for the period in question to determine that plaintiff's symptoms best fit Listing 12.04 Depressive, bipolar and related disorders: Unspecified Mood Disorder and Listing 12.08 Personality and Impulse control disorders: Unspecified Personality Disorder. Dkt. #5, p.888. Dr. Kalb opined that plaintiff would be moderately limited in understanding, remembering or applying information; markedly limited in

interacting with others; moderately limited in concentrating, persisting or maintaining pace; and moderately limited in adapting or managing herself. Dkt. #5, p.883. In reaching these conclusions, Dr. Kalb acknowledged that intellectual testing in 2003 and 2006 placed plaintiff in the low average and borderline range of intellectual functioning and suggested further psychological testing to obtain a full objective assessment of her cognitive functioning. Dkt. #5, pp. 889 & 890. Dr. Kalb also noted plaintiff's difficulties with anger, irritability and impulse control and history of poor decision-making, as well as the presence of a substance use disorder. Dkt. #5, p.889.

Dr. Kalb did not believe that plaintiff's mental condition prevented treatment, but did note a lack of compliance with treatment, including a failure to complete substance abuse treatment or remain in therapy and questions about compliance with psychotropic medication. Dkt. #5, p.890. Setting aside plaintiff's drug addiction or alcoholism ("DAA"), Dr. Kalb opined that plaintiff would be mildly limited in her ability to understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions, and moderately limited in her ability to understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions. Dkt. #5, p.894. Dr. Kalb further opined that plaintiff would have moderate limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting and marked limitations in her ability to interact appropriately with the public, with her supervisors and with her co-workers. Dkt. #5, p.895. Finally, Dr. Kalb opined that plaintiff should be able to maintain pace, speed and quotas. Dkt. #5, p.895.

The ALJ rendered a decision that plaintiff was not disabled on July 27, 2017. Dkt. #5, pp.11-29. More specifically, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff had not engaged in substantial gainful activity since she filed her application for benefits on January 16, 2015; (2) plaintiff's unspecified mood disorder, unspecified personality disorder and substance use disorder constitute severe impairments; (3) plaintiff's impairments did not meet or equal any listed impairment; (4) plaintiff retained the residual functional capacity to perform work at all exertional levels with the following nonexertional limitations: plaintiff should avoid commercial driving and dangerous moving machinery and unprotected heights and could not perform fast paced work or work with high production goals but could understand, remember and carry out instructions for short, routine, repetitive tasks commensurate with unskilled work, sustain attention and concentration for two-hour segments of time in an eight-hour day, tolerate brief and superficial work-related, task-oriented contact with coworkers and supervisors and occasional to rare brief and superficial contact with the public, and adapt to changes in the workplace for routine, repetitive tasks; and (5) plaintiff was capable of performing work as an industrial cleaner, laundry worker or janitor, each of which were unskilled medium exertion jobs, and as a routing clerk, mail sorter, housekeeper cleaner, retail marker or electrical accessories assembler, each of which were unskilled light jobs and was not, therefore, disabled within the meaning of the SSA. Dkt. #5, pp.16-28.

In reaching this determination, the ALJ gave great weight to Dr. Kalb's opinions which were based upon a longitudinal review of the objective record evidence

and significant weight to the opinion of the May 18, 2015 consultative psychological

examination of plaintiff by Dr. Ransom, Ph.D. Dkt. #5, pp.25-26. Dr. Ransom diagnosed

plaintiff with PTSD, currently mild; social phobia, currently mild; bipolar disorder,

currently mild; current marijuana dependence and alcohol, cocaine and heroin

dependence in remission and determined that her evaluation of plaintiff was consistent

with mild psychiatric conditions which would not significantly interfere with plaintiff's

ability to function on a daily basis. Dkt. #5, p.384. More specifically, Dr. Ransom opined

that plaintiff

> will show no evidence of difficulty following and
> understanding simple directions and instructions,
> perform[ing] simple tasks independently, maintain[ing]
> attention and concentration for simple tasks, maintain[ing] a
> simple regular schedule, learn[ing] simple new tasks. She
> will have mild difficulty performing complex tasks, relat[ing]
> adequately with others and appropriately deal[ing] with
> stress due to posttraumatic stress disorder currently mild,
> social phobia currently mild, bipolar disorder currently mild.

Dkt. #5, p.383. The ALJ further noted plaintiff's conservative mental health counseling,

routine psychiatric medication management, noncompliance with treatment, reported

activities of daily living and ongoing substance use. Dkt. #5, p.26.


The Appeals Council denied review on May 23, 2018. Dkt. #5, p.4.

Plaintiff commenced this action seeking review of the Commissioner's final decision on

July 24, 2018. Dkt. #1.


## DISCUSSION AND ANALYSIS

"In reviewing a final decision of the SSA, this Court is limited to

determining whether the SSA's conclusions were supported by substantial evidence in

the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 404.1505(a). The Commissioner must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520(a). At step one, the claimant must demonstrate that he is not engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). At step two, the claimant must demonstrate that he has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 404.1520(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to

disability benefits. 20 C.F.R. § 404.1520(d). If the impairment does not meet the criteria

of a disabling impairment, the Commissioner considers whether the claimant has

sufficient RFC for the claimant to return to past relevant work. 20 C.F.R. § 404.1520(e)-

(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to

the Commissioner to demonstrate that the claimant could perform other jobs which

exist in significant numbers in the national economy, based on claimant's age,

education and work experience. 20 C.F.R. § 404.1520(g).


      Plaintiff argues that the ALJ failed to account for historic evidence of

PTSD, learning disability and borderline intellectual functioning at step two and to

properly assess whether plaintiff's combined mental conditions met the criteria of a

disabling impairment under the listings and thereafter failed to properly assess the

impact of these conditions on plaintiff's RFC. Dkt. #11-1, pp.8-18. Plaintiff further notes

that the ALJ failed to consider Dr. LaRoche's diagnosis of ADHD and potential autism

disorder and failed to account for the functional impairments identified by plaintiff's

treating psychiatrist, Dr. Wohltmann, and Shannon Koch, LMSW, or appropriately

address plaintiff's stress limitations. Dkt. #11-1, pp.14 & 18-26. Plaintiff also argues that

it was error for the ALJ to determine that plaintiff's substance abuse, rather than her

mental illness, caused her functional impairments. Dkt. #11-1, pp.15-16. Finally, plaintiff

argues that the ALJ failed to evaluate reasons for plaintiff's noncompliance with

treatment. Dkt. #11-1, pp.26-30. Plaintiff argues that her mental health and cognitive

impairments impacted her ability to manage her self and live independently. Dkt. #11-1,

pp.27-30.

The Commissioner responds that the ALJ acknowledged plaintiff's diagnoses and explained the basis for considering plaintiff's impairments pursuant to listing 12.02, 12.04, 12.06 and 12.08. Dkt. #18-1, pp.12-13. In any event, the Commissioner notes that the ALJ considered all of plaintiff's impairments, irrespective of plaintiff's diagnoses, in determining plaintiff's RFC. Dkt. #18-1, pp.14-17. The Commissioner argues that it was proper for the ALJ to rely upon consulting opinions in light of the absence of opinion regarding plaintiff's functional limitations by her treating providers. Dkt. #18-1, p.12. More specifically, the Commissioner argues that it was proper for the ALJ to rely upon the opinion of Dr. Kalb because she based her opinion upon a review of the entire record, which included the underlying treatment notes of plaintiff's health care providers. Dkt. #18-1, pp.14 & 18-21.

Plaintiff replies that the consulting opinions contradict plaintiff's longitudinal treatment record. Dkt. #19, p.2. Plaintiff also argues that the ALJ failed to develop the record by obtaining DSS medical exemption assessments from her medical providers or requesting additional cognitive testing as recommended. Dkt. #19, pp.3-4. Plaintiff argues that the record is clear that plaintiff is incapable of independent living, let alone sustained competitive employment. Dkt. #19, pp.6-7.

In light of the essentially non-adversarial nature of a social security proceeding, it is well accepted that an ALJ has an affirmative duty to develop the administrative record. *See, e.g., Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009). Due to the difficulty in determining whether individuals suffering from mental illness will

be able to adapt to the demands or stress of the workplace, the duty to develop the record is particularly important where mental illness is present. *Marcano v. Berryhill*, 17 Civ. 4442, 2018 WL 5619749, at *11 (S.D.N.Y. July 13, 2018). This duty exists even when the claimant is represented by counsel. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). However, the ALJ is required to seek out additional evidence only where there are obvious gaps in the record. *Eusepi v. Colvin,* 595 Fed. App'x 7, 9 (2d Cir. 2014). The ALJ is not obligated to seek additional medical records where the record evidence is sufficient for the ALJ to make a disability determination. *Johnson v. Comm'r of Soc. Sec.,* 16-CV-831, 2018 WL 1428251, at *5 (W.D.N.Y. March 22, 2018).

SSA regulations in effect when plaintiff filed her claim provide that the agency "will request a medical source statement," although the lack of a medical source statement does not, by itself, necessarily render the record incomplete. *Pellam v. Astrue*, 508 Fed. App'x 87, 90 n.2 (2d Cir. 2013), *citing* 20 C.F.R. § 404.1513(b)(6). In *Tankisi v. Commissioner of Social Security*, for example, the Court of Appeals declined to remand where an ALJ failed to request medical source opinions but the extensive medical record contained an assessment of plaintiff's limitations by the treating physician. 521 Fed. App'x 29, 34 (2d Cir. 2013). In *Pellam*, the Court of Appeals determined that the ALJ was not required to obtain a medical source statement from one of plaintiff's treating physicians because the ALJ's assessment of plaintiff's RFC was largely supported by a consultative examiner's report. 508 Fed. App'x at 90. Thus, an RFC finding without treating source opinion evidence will be sufficient only when the record is clear and contains some useful assessment of the claimant's limitations from

a medical source. *Smith v.Comm'r of Soc. Sec.*, 337 F. Supp.3d 216, 225 (W.D.N.Y. 2018).

In the instant case, the absence of medical source opinion statements from plaintiff's treatment providers is not a basis for remand because the ALJ requested a longitudinal review of the objective record evidence from a psychological consultant who reviewed the record, including the records of Dr. LaRoche, Dr. Wohltmann and LMSW Koch, as well as treatment records as far back as 2004, and considered them in accordance with the parameters of SSA regulations. Based upon these records, Dr. Kalb determined that plaintiff would have a marked limitation in interacting with others and moderate limitations in understanding, remembering or applying information; concentrating, persisting or maintaining pace; and adapting or managing herself. Despite such limitations, Dr. Kalb opined that plaintiff would be able to understand, remember and carry out simple, repetitive tasks and make simple work related decisions as required by unskilled work. Although this opinion is more restrictive than that of the consulting examiner, psychologist Christine Ransom, Ph.D., her opinion was based upon a single examination, and is, therefore, considered a mere snapshot of plaintiff's mental status. *See Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019) (noting that a one-time snapshiot of a plaintiff's status based upon a single consultative examination may not be indicative of a plaintiff's longitudinal mental health). Nevertheless, "[i]t is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Baszto v. Astrue*, 700 F. Supp.2d 242, 249 (N.D.N.Y. 2010).

Contrary to plaintiff's argument, Dr. Kalb acknowledged plaintiff's traumatic history and numerous diagnoses, many of which were diagnosed by history and some of which were only suspected, but properly confined her analysis to the functional impairments resulting from plaintiff's symptoms during the relevant period of alleged disability. *See Gallup v. Comm'r of Soc. Sec.*, 2014 WL 2480175, at *5 (N.D.N.Y. June 3, 2014) (so long as the functional limitations caused by plaintiff's mental impairments are considered, it is harmless error to fail to recognize a diagnosis correctly). Dr. Kalb specifically noted plaintiff's intellectual testing, history of special education, and GED, as well as the consultative examiner's opinion, based upon, *inter alia*, plaintiff's ability to count backwards from 20; do simple calculations and serial threes without error, that plaintiff's intellectual functioning was in the low average range. Plaintiff's treatment records support this assessment with records indicating below average and average intelligence. In light of this evidence, it was not error for the ALJ to decline to request a consultative intelligence examination. *See Jones v. Colvin*, 6:16-CV-0044, 2017 WL 3016839 at *6 (N.D.N.Y. July 14, 2017) (ALJ had no duty to order a consultative intellectual evaluation where evidence was sufficient to assess intellectual capacity). The ALJ properly accounted for plaintiff's intellectual capacity, and the functional limitations it would impose, by limiting plaintiff to unskilled work. *See Becker v. Berryhill*, 17-CV-770, 2019 WL 324228, at *4 (W.D.N.Y. Jan. 24, 2019) (limitation to unskilled work captured functional limitations regarding, *inter alia*, below average intellectual functioning).

Dr. Kalb also acknowledged that plaintiff's treatment records revealed difficulties with anger, irritability and impulse control and noted that the record indicated

that plaintiff should have no contact with the general public and limited, task focused contact with supervisors and co-workers. Dr. Kalb further recognized that plaintiff's treatment notes demonstrate that plaintiff is easily frustrated and upset, prompting her to recommend work which was low stress in nature requiring limited changes or shifts. The ALJ properly accounted for plaintiff's marked limitation in dealing with others by restricting her to brief and superficial work-related, task-oriented contact with coworkers and supervisors and occasional to rare brief and superficial contact with the public. *See Fiducia v. Comm'r of Soc. Sec*., No. 1:13-CV-285, 2015 WL 4078192, at *4 (N.D.N.Y. July 2, 2015) (marked limitation interacting with others does not conclusively demonstrate inability to work). The ALJ further accounted for plaintiff's capacity for work- related stress by precluding her from fast paced work or work with high production goals and limiting her to routine, repetitive tasks. *See Xenia v. Saul*, 5:18-CV-224, 2019 WL 3412645, at *6 (N.D.N.Y. July 29, 2019) (marked limitation dealing with stress does not automatically mandate a finding of disability).

Finally, the ALJ's determination that no evidence indicates that a mental impairment prevents treatment is supported by substantial evidence. To the contrary, substantial evidence suggests that plaintiff's substance abuse rather than her mental impairments, are impeding treatment. As the ALJ noted, treatment records during the relevant period focus on abstaining from substance abuse and the record reveals that plaintiff was capable of participating in treatment decisions, including psychotropic medication management and consideration of therapeutic options.

**CONCLUSION**

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #11), is denied and the Commissioner's motion for judgment on the pleadings (Dkt. #18), is granted.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**DATED:** **Buffalo, New York**
**March 30, 2020**

 *s/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**